## CIRCUIT COURT OF DESHA COUNTY, ARKANSAS

**CGH OF MCGEHEE AR 2011, L.P.**

    **Plaintiff,**

**v.**                          Case No: CV-2016-156-3

**DEVERE CONSTRUCTION COMPANY,
INC. and LIBERTY MUTUAL
INSURANCE COMPANY,**

    **Defendants.**

## COMPLAINT FOR BREACH OF CONTRACT, DAMAGES, AND RECOVERY ON PERFORMANCE BOND

COMES NOW, the Plaintiff, CGH of McGehee AR 2011, L.P. ("CGH of McGehee"), and for its cause of action against Defendants, DeVere Construction Company, Inc. ("DeVere"), and Liberty Mutual Insurance Company ("Liberty Mutual"), would respectfully show and state unto the Court as follows:

### I.
### PARTIES AND JURISDICTION

1.    CGH of McGehee, is a Mississippi limited partnership with its principal offices located at 4410 Leisure Time Drive, Diamondhead, Mississippi 39525. CGH of McGehee is properly registered to transact business in the State of Arkansas.

2.    DeVere Construction Company, Inc. is upon information and belief a Michigan corporation with its principal offices located at 1030 DeVere Drive, Alpena, Michigan 49707. DeVere may be served with process by serving its registered agent, National Registered Agents, Inc. of AR, at 124 W. Capital Avenue, Suite 1900, Little Rock, Arkansas 72201.

3.    Liberty Mutual Insurance Company is a foreign corporation authorized to transact

<div style="border:1px solid black; display:inline-block; padding:4px;">EXHIBIT A</div>

FILED 12-29-16 BY
@ 9:00 O'CLOCK A M
MINNIE HAYWOOD - DESHA COUNTY
CIRCUIT COURT CLERK
ARKANSAS CITY, ARKANSAS

business within the State of Arkansas, and may be served with process by serving its registered agent, Corporation Service Company, at 300 South Spring Street, Suite 900, Little Rock, Arkansas 72201.

4.     Venue and jurisdiction in this Court are proper in that the real property which is the subject of the dispute in this matter and for which CGH of McGehee seeks recovery for damages thereto in this litigation is located in Desha County, Arkansas, and the contract by and between CGH of McGehee and DeVere for improvement of said real property was performed in Desha County, Arkansas.

## II.
## FACTS APPLICABLE TO ALL COUNTS

5.     CGH of McGehee was the record owner of a tract of property located in Desha County, Arkansas upon which it developed a residential housing project (hereinafter the "Real Property").

6.     CGH of McGehee entered into a construction agreement with DeVere, under which DeVere agreed to supply the labor, services and materials necessary for construction of 18 individual residential structures and a community building necessary for completion of the housing development (hereinafter the "Project"). The agreement by and between CGH of McGehee and DeVere was an American Institute of Architects standard form A101 agreement (1997 Edition) (hereinafter the "Contract"), and a copy of the Contract is attached hereto and incorporated herein by reference as **Exhibit A**.

7.     Liberty Mutual, as surety, issued a performance bond covering the Project in the principal amount of Three Million Eight Hundred Eighty Thousand Five Hundred and 00/100 Dollars ($3,880,500.00) on behalf of DeVere as its principal and CGH of McGehee as the obligee (hereinafter the "Performance Bond"). A copy of the Performance Bond is attached

- 2 -

hereto and incorporated herein by reference as **Exhibit B**.

8.      The original Contract value for the Project was Three Million Eight Hundred Eighty Thousand Five Hundred and 00/100 Dollars ($3,880,500.00). The Contract provided that DeVere would achieve substantial completion of the entire Project within 270 days from commencement of the Project.

9.      The Contract incorporated by reference the General Conditions of the Contract for Construction, AIA A201 (1997 Edition) (hereinafter the "General Conditions").

10.     Section 3.1.2 of the General Conditions provides that "the Contractor shall perform the Work in accordance with the Contract Documents."

11.     Section 3.3.3 of the General Conditions provides that "the Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors."

12.     Section 3.5 of the General Conditions provides as follows:

**WARRANTY.**

The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective.

13.     Section 3.7.2 of the General Conditions provides that "the Contractor shall comply with and give notices required by laws, ordinances, rules, regulations, and lawful orders of public authorities applicable to performance of the Work."

14.     Section 3.18.1 of the General Conditions provides that to the fullest extent

- 3 -

permitted by law:

> The Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent act or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

15.     Section 8.2.1 of the General Conditions provides that "time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work."

16.     Section 12.2.1.1 of the General Conditions provides that the "Contractor shall promptly correct Work rejected by the Architect for failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections, and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense."

17.     DeVere failed to timely and fully perform all work required under the Contract.

18.     DeVere's work on the Project contained numerous defects and deficiencies, including but not limited to, the following:

(a)     deficient construction and/or installation of the eaves on several residential units leaving a gap between the drip edge and fascia resulting in damages to the units, including but not limited to, water intrusion;

(b)     failure to complete the rough grading scope of work for the residential lots, resulting in Plaintiff having to complete the scope of work and incurring significant costs to perform work required of DeVere under the Contract;

(c) defective construction and/or improper installation of siding on the residential units resulting in water infiltration which caused substantial damages, including but not limited to, damages to drywall, insulation, cabinet and mold issues;

(d) defective construction and/or improper installation of concrete carports resulting in water ponding against walls and entryways;

(e) defective construction and/or improper installation of soldier course brick resulting in water intrusion to the residential units;

(f) defective, improper, inadequate and incomplete installation of cellulose insulation in the attics for the residential units; and

(g) defective construction and/or improper construction methods related to numerous roofs on the residential units which were left open during construction resulting in damages to the interior of the residential units and mold issues within the units.

19.    As a result of the defects, deficiencies and incomplete work alleged hereinabove, the residential units on the Project experienced substantial water intrusion and were substantially damaged, and CGH of McGehee sustained substantial damages.

### III.
### COUNT ONE – BREACH OF CONTRACT/DEVERE

20.    Plaintiff reasserts and realleges all allegations contained in ¶¶1 through 19 of this Complaint as if fully set forth herein.

21.    DeVere's failure to properly construct the Project in accordance with the Contract and in a workmanlike manner and its performance of substantial defective work as more fully alleged hereinabove constitutes a material breach of the Contract.

22.    Plaintiff provided numerous notices to DeVere of its defective and incomplete work on the Project and opportunities to cure same, yet DeVere has failed and refused to remedy these defects.

23.    Plaintiff has performed all of the covenants and conditions of the Contract to be

performed·on its part, except to the extent that such performance has been prevented or excused by DeVere's failure to properly and timely complete all work required under the Contract and to properly construct all work under the Contract in accordance with the Contract requirements.

24.     As a direct and proximate result of the numerous defects and deficiencies more fully alleged hereinabove and DeVere's failure to timely and properly correct same, Plaintiff has expended substantial sums, and will continue to expend sums, to correct all defects and incomplete work on the part of DeVere.

25.     As a result of DeVere's material breach of the parties' Contract, Plaintiff is entitled to a judgment against DeVere for breach of contract in an amount to be proven at trial in the approximate amount of $296,956.00, plus interest, expenses and attorney's fees.

## IV.
## · RECOVERY ON PERFORMANCE BOND – BREACH OF CONTRACT/LIBERTY MUTUAL

26.     Plaintiff reasserts and realleges all allegations contained in ¶¶1 through 25 of this Complaint as if fully set forth herein.

27.     The Performance Bond issued by Liberty Mutual as surety. with DeVere as principal and CGH of McGehee as obligee thereon, constitutes a contractual agreement which CGH of McGehee is entitled to enforce.

28.     Pursuant to §1 of the Performance Bond, "The Contractor and Surety, jointly and severally, bind themselves, their heirs, their executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference."

29.     Plaintiff has complied with all conditions of the Performance Bond, including but not limited to those set forth in §3 thereof, including but not limited to, providing notice to the

- 6 -

surety of DeVere's defaults under the Contract and requesting a conference with the surety. Further, Liberty Mutual has waived its entitlement to rely on conditions precedent set forth in the Performance Bond.

30.     On or about March 9, 2016, Plaintiff corresponded with Liberty Mutual and DeVere notifying Liberty Mutual that DeVere was in default under the terms and conditions of the Contract and requesting that Liberty Mutual honor its obligations under the terms and provisions of the Performance Bond. A copy of Plaintiff's March 9, 2016 default notice to Liberty Mutual and DeVere is attached hereto and incorporated herein as **Exhibit C**.

31.     On March 31, 2016, Plaintiff again corresponded with Liberty Mutual (in care of its counsel, John E. Sebastian) and DeVere to again notify Liberty Mutual of DeVere's defaults under the terms of the Contract and to request that the surety perform its obligations under the terms and conditions of the Performance Bond. A copy of Plaintiff's March 31, 2016 default notice to Liberty Mutual is attached hereto and incorporated herein as **Exhibit D**.

32.     To date, Liberty Mutual has failed and/or refused to facilitate DeVere's correction of all defective work, failed to perform correction of all defective work on behalf of DeVere, and has failed to ensure faithful performance and completion of the Contract pursuant to its terms as required under the Performance Bond. These failures constitute a material breach of the terms and conditions of the Performance Bond by Liberty Mutual.

33.     As a direct and proximate result of Liberty Mutual's material breach of the terms and conditions of the Performance Bond, Plaintiff has sustained damages, including but not limited to, all costs and expenses it has incurred and will incur to cure all of the defects and deficiencies of the work of DeVere.

34.     Plaintiff is entitled to a judgment under the Performance Bond and for breach of

contract against Liberty Mutual in an amount to be proven at trial but in the proximate amount of $296,956.00, plus interest, expenses and attorney's fees.

## V.
## BREACH OF WARRANTY
## (DEVERE AND LIBERTY MUTUAL)

35.    Plaintiff reasserts and realleges all allegations contained in ¶¶1 through 34 of this Complaint as if fully set forth herein.

36.    Pursuant to the terms and provisions of the Contract, DeVere warranted that all work would be performed in a workmanlike manner and that any defects and deficiencies would be promptly corrected by DeVere.

37.    As surety on the Performance Bond, Liberty Mutual covenanted to Plaintiff to be jointly and severally bound with DeVere and their heirs, executors, administrators, successors and assigns for the full performance of the Contract.

38.    As more specifically alleged herein, the Project was inadequately constructed resulting in the above described defective conditions such that the Project was not of merchantable quality or erected in a reasonably workmanlike manner.

39.    Plaintiff has performed under the terms and conditions of the Contract pursuant to the express warranties under the Contract and has timely notified DeVere and Liberty Mutual of all defects and deficiencies in the work of DeVere on the Project. Notwithstanding any such notices, DeVere and Liberty Mutual have failed and/or refused to acknowledge responsibility for these defects or otherwise cause the appropriate restoration and/or repairs to be made to the Project at their expense or to otherwise contribute to the costs of these repairs.

40.    As a direct and proximate result of the foregoing breach of the express warranty contained in the Contract and the actions and/or omissions of DeVere and Liberty Mutual,

Plaintiff has sustained damages, including but not limited to, costs incurred by the Plaintiff required to perform works of repair, restoration and construction of portions of the Project which were defective, deficient and improperly constructed by DeVere.

41. As a direct and proximate result of the foregoing breach of express warranty under the Contract by DeVere and Liberty Mutual, and as a result of actions and omissions of DeVere and Liberty Mutual in failing to honor the express warranty or remedy the defects alleged herein, Plaintiff has sustained damages in an amount to be proven at trial in the approximate amount of $296,596.00, plus interest, expenses and attorney's fees and is entitled to a judgment for breach of contract and breach of warranty against Liberty Mutual and DeVere.

WHEREFORE, PREMISES CONSIDERED, CGH of McGehee respectfully prays:

1. That a copy of this Complaint be served upon Defendants and the Defendants be required to file an answer to the Complaint within the time set forth in the Arkansas Rules of Civil Procedure;

2. That CGH of McGehee be awarded a judgment for breach of contract against DeVere in an amount to be proven at trial of approximately $296,956.00, plus interest, expenses and attorney's fees;

3. That CGH of McGehee be awarded a judgment under the Performance Bond and for breach of contract against Liberty Mutual and that Liberty Mutual's liability be joint and several with the liability of DeVere, and that judgment be entered in an amount to be proven at trial of approximately $296,956.00, plus interest, expenses and attorney's fees;

4. That in the alternative, CGH of McGehee be awarded a judgment against DeVere and Liberty Mutual for breach of warranty in amount to be proven at trial of approximately $296,956.00, plus interest, expenses and attorney's fees;

5.      That CGH of McGehee be awarded pre-judgment interest and post-judgment interest on all amounts from the date due until paid;

6.      That CGH of McGehee be awarded its costs and expenses, including but not limited to, attorney's fees incurred in prosecuting this cause; and

7.      That CGH of McGehee be awarded such other, further, general and specific relief to which it may be entitled and to which this Court shall deem to be just and equitable.

RESPECTFULLY SUBMITTED,
CGH OF MCGEHEE AR 2011, L.P.,
Plaintiff

By:   _____
Rita Reed Harris (AR 93230)
RITA REED HARRIS, P.A.
P.O. Box 787
Forrest City, AR 72336
870-633-9900 (Phone)
870-633-9903 (Fax)
ritareedharris@att.net

4843-9067-2701, v. 1



1997 EDITION

# AIA DOCUMENT A101-1997

*Standard Form of Agreement Between Owner and Contractor where the basis of payment is a STIPULATED SUM*

AGREEMENT made as of the      fourth      day of June
in the year      2013
*(In words, indicate day, month and year)*

BETWEEN the Owner:
*(Name, address and other information)*

> CGB of McGehee AR 2011, L.P.
> 4410 Leisure Time Drive
> Diamondhead, MS 39525

and the Contractor:
*(Name, address and other information)*

> DeVere Construction Company, Inc
> 1030 DeVere Drive
> Alpena, MI 49707

The Project is:
*(Name and location)*

> Cypress Grove Homes of McGehee
> (Single Family Homes and Community Center)

The Architect is:
*(Name, address and other information)*

> Douglas A. Arnold & Associates
> 901 Central Avenue
> Hot Springs, Arkansas 71902

The Owner and Contractor agree as follows.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by the Associated General Contractors of America.

© 1915 · A I A ®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

EXHIBIT

A

## ARTICLE 1  THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

## ARTICLE 2  THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

## ARTICLE 3  DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

3.1    The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.        To be determined
*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

3.2    The Contract Time shall be measured from the date of commencement.

3.3    The Contractor shall achieve Substantial Completion of the entire Work not later than
270         days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*



© 1997  AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 4 CONTRACT SUM

4.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be **Three Million Eight Hundred Eighty Thousand Five Hundred and 00/100** Dollars ($3,880,500.00), subject to additions and deductions as provided in the Contract Documents.

4.2 The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner. **N/A.**

*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires.)*

4.3 Unit prices, if any, are as follows: **N/A.**

## ARTICLE 5 PAYMENTS

### 5.1 PROGRESS PAYMENTS

5.1.1 Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

5.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

5.1.3 Provided that an Application for Payment is received by the Architect not later than the 30th day of a month, the Owner shall make payment to the Contractor not later than the 30th day of the following month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than 30 days after the Architect receives the Application for Payment.

5.1.4 Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.



©1997   AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C.20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

5.1.5  Applications for Payment shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

5.1.6  Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1  Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of      Five      percent ( 5 %). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Subparagraph 7.3.8 of AIA Document A201-1997;

.2  Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of      Five      percent ( 5 %);

.3  Subtract the aggregate of previous payments made by the Owner; and

.4  Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Paragraph 9.5 of AIA Document A201-1997.

5.1.7  The progress payment amount determined in accordance with Subparagraph 5.1.6 shall be further modified under the following circumstances:

.1  Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Architect shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and *(Subparagraph 9.8.5 of AIA Document A201-1997 requires release of applicable retainage upon Substantial Completion of Work with consent of surety, if any.)*

.2  Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Subparagraph 9.10.3 of AIA Document A201-1997.

5.1.8  Reduction or limitation of retainage, if any, shall be as follows:
*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Clauses 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)*

5.1.9  Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

5.2  FINAL PAYMENT

5.2.1  Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

.1  the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Subparagraph 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and

.2  a final Certificate for Payment has been issued by the Architect.



©1997   A I A®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.



§ 5.2 The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

## ARTICLE 6 TERMINATION OR SUSPENSION

§ 6.1 The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201-1997.

§ 6.2 The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997.

## ARTICLE 7 MISCELLANEOUS PROVISIONS

§ 7.1 Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

§ 7.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

§ 7.3 The Owner's representative is:
*(Name, address and other information)*

Gary Gibbs
4410 Leisure Time Drive
Diamondhead, MS 39525

§ 7.4 The Contractor's representative is:
*(Name, address and other information)*

Brock Johnson
1030 DeVere Drive
Alpena, MI 49707

§ 7.5 Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

§ 7.6 Other provisions:

© 1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 8 ENUMERATION OF CONTRACT DOCUMENTS

8.1   The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:      To be determined.

8.1.1   The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997.

8.1.2   The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201-1997.

8.1.3   The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated              N/A              , and are as follows:

| Document | Title | Pages |
|----------|-------|-------|

8.1.4.   The Specifications are those contained in the Project Manual dated as in Subparagraph 8.1.3, and are as follows:      To be determined.
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

| Section | Title | Pages |
|---------|-------|-------|

8.1.5   The Drawings are as follows, and are dated                                          unless a different date is shown below:      To be determined.
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*

| Number | Title | Date |
|--------|-------|------|



© 1997   A I A ®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

§ 8.1.6  The Addenda, if any, are as follows:     N/A

Number          Date                    Pages

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 8.

§ 8.1.7  Other documents, if any, forming part of the Contract Documents are as follows:     N/A
(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

OWNER (Signature)                    CONTRACTOR (Signature)

Gary Gibbs    Chief Manager          Cheryl Lumsden, Treasurer
(Printed name and title)             (Printed name and title)

CAUTION: You should sign an original AIA document or a licensed reproduction. Originals contain the AIA logo printed in red; licensed reproductions are those produced in accordance with the Instructions to this document.

© 1997   A I A ®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Bond No. 013125890

# ≋AIA® Document A312™ – 2010

## Performance Bond

**CONTRACTOR:**
*(Name, legal status and address)*
DeVere Construction Company, Inc.
1030 DeVere Drive
Alpena, MI 48707

**SURETY:**
*(Name, legal status and principal place
of business)*

Liberty Mutual Insurance Company
5600 New King Street, Suite 360
Troy, MI 48098

**OWNER:**
*(Name, legal status and address)*
CGH of McGeHee AR 2011, L.P.
4410 Leisure Time Drive
Diamondhead, MS 39525

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

**CONSTRUCTION CONTRACT**
Date:       June 4, 2013

Amount:     Three Million Eight Hundred Eighty Thousand Five Hundred and 00/100
            ($3,880,500.00) Dollars
Description:
*(Name and location)*   Cypress Grove Homes of McGeHee
                        (Single Family Homes and Community Center)

**BOND**
Date:       June 4, 2013
*(Not earlier than Construction Contract Date)*

Amount:     Three Million Eight Hundred Eighty Thousand Five Hundred and 00/100
            ($3,880,500.00) Dollars

Modifications to this Bond:    ☒ None       ☐ See Section 16

**CONTRACTOR AS PRINCIPAL**
Company:            *(Corporate Seal)*
DeVere Construction Company, Inc.

Signature: *Cheryl Lumsden*
Name       Cheryl Lumsden
and Title: Treasurer

**SURETY**
Company:            *(Corporate Seal)*
Liberty Mutual Insurance Company

Signature: *Michelle Buechel*
Name
and Title:  Michelle Buechel, Attorney-in-fact

*(Any additional signatures appear on the last page of this Performance Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*
**AGENT or BROKER:**

Guy Hurley Blaser & Heuer, LLC
1050 Kirts Blvd., Suite 500
Troy, MI 48084
248-519-1400

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*

Douglas A. Arnold & Associates
901 Central Avenue
Hot Springs, Arkansas 71902

---

EXHIBIT

B

§ 1 The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

§ 2 If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except when applicable to participate in a conference as provided in Section 3.

§ 3 If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after

.1 the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

.2 the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

.3 the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

§ 4 Failure on the part of the Owner to comply with the notice requirement in Section 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice.

§ 5 When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

§ 5.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

§ 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

§ 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

.2 Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

§ 6 If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 5.4, and the Owner refuses the payment or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

AIA Document A312™ – 2010. The American Institute of Architects.

§ 7 If the Surety elects to act under Section 5.1, 5.2 or 5.3, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. Subject to the commitment by the Owner to pay the Balance of the Contract Price, the Surety is obligated, without duplication, for

    .1    the responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

    .2    additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 5; and

    .3    liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

§ 8 If the Surety elects to act under Section 5.1, 5.3 or 5.4, the Surety's liability is limited to the amount of this Bond.

§ 9 The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, successors and assigns.

§ 10 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§ 11 Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after a declaration of Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

§ 12 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears.

§ 13 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

§ 14 Definitions
§ 14.1 Balance of the Contract Price. The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

§ 14.2 Construction Contract. The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and changes made to the agreement and the Contract Documents.

§ 14.3 Contractor Default. Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with a material term of the Construction Contract.

§ 14.4 Owner Default. Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

§ 14.5 Contract Documents. All the documents that comprise the agreement between the Owner and Contractor.

§ 15 If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

**§ 16** Modifications to this bond are as follows:

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |
| | | | |
| Signature: | | Signature: | |
| Name and Title: | | Name and Title: | |
| Address | | Address | |

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

Bond No. 013125690

# ▩AIA® Document A312™ – 2010

## Payment Bond

**CONTRACTOR:**
*(Name, legal status and address)*
DeVere Construction Company, Inc.
1030 DeVere Drive.
Alpena, MI 48707

**SURETY:**
*(Name, legal status and principal place of business)*
Liberty Mutual Insurance Company
5800 New King Street, Suite 360
Troy, MI 48098

**OWNER:**
*(Name, legal status and address)*
CGH of McGeHee AR 2011, L.P.
4410 Leisure Time Drive
Diamondhead, MS 39525

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

**CONSTRUCTION CONTRACT**
Date:     June 4, 2013

Amount;   Three Million Eight Hundred Eighty Thousand Five Hundred and 00/100
          ($3,880,500.00) Dollars
Description:
*(Name and location)*     Cypress Grove Homes of McGeHee
                          (Single Family Homes and Community Center)

**BOND**
Date:     June 4, 2013
*(Not earlier than Construction Contract Date)*

Amount:   Three Million Eight Hundred Eighty Thousand Five Hundred and 00/100
          ($3,880,500.00) Dollars

Modifications to this Bond:   ☒ None       ☐ See Section 18

**CONTRACTOR AS PRINCIPAL**
Company:        *(Corporate Seal)*
DeVere Construction Company, Inc.

Signature: *[signature]*
Name   Cheryl Lumsden
and Title: Treasurer

**SURETY**
Company:        *(Corporate Seal)*
Liberty Mutual Insurance Company

Signature: *[signature]*
Name   Michelle Buechel, Attorney-in-fact
and Title:

*(Any additional signatures appear on the last page of this Payment Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*
**AGENT or BROKER:**

Guy Hurley Blaser & Heuer, LLC
1080 Kirts Blvd., Suite 500
Troy, MI 48084
248-519-1400

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*

Douglas A. Arnold & Associates
901 Central Avenue
Hot Springs, Arkansas 71902

Init.

AIA Document A312™ – 2010. The American Institute of Architects.      061110

5

§ 1 The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

§ 2 If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

§ 3 If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

§ 4 When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

§ 5 The Surety's obligations to a Claimant under this Bond shall arise after the following:

§ 5.1 Claimants, who do not have a direct contract with the Contractor,
.1 have furnished a written notice of non-payment to the Contractor, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were, or equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90) days after having last performed labor or last furnished materials or equipment included in the Claim; and
.2 have sent a Claim to the Surety (at the address described in Section 13).

§ 5.2 Claimants, who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety (at the address described in Section 13).

§ 6 If a notice of non-payment required by Section 5.1.1 is given by the Owner to the Contractor, that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under Section 5.1.1.

§ 7 When a Claimant has satisfied the conditions of Sections 5.1 or 5.2, whichever is applicable, the Surety shall promptly and at the Surety's expense take the following actions:

§ 7.1 Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and

§ 7.2 Pay or arrange for payment of any undisputed amounts.

§ 7.3 The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement. If, however, the Surety fails to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

§ 8 The Surety's total obligation shall not exceed the amount of this Bond, plus the amount of reasonable attorney's fees provided under Section 7.3, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

§ 9 Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any construction performance bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

AIA Document A312™ – 2010. The American Institute of Architects.

§ 16.4 Owner Default. Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

§ 16.5 Contract Documents. All the documents that comprise the agreement between the Owner and Contractor.

§ 17 If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

§ 18 Modifications to this bond are as follows:

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |
| | | | |
| Signature: | | Signature: | |
| Name and Title: | | Name and Title: | |
| Address | | Address | |

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

**THIS POWER OF ATTORNEY IS NOT VALID UNLESS IT IS PRINTED ON RED BACKGROUND.**
This Power of Attorney limits the acts of those named herein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

Certificate No. 6817519

American Fire and Casualty Company          Liberty Mutual Insurance Company
The Ohio Casualty Insurance Company          Peerless Insurance Company
West American Insurance Company

# POWER OF ATTORNEY

KNOWN ALL PERSONS BY THESE PRESENTS: That American Fire & Casualty Company and The Ohio Casualty Insurance Company are corporations duly organized under the laws of the State of Ohio, that Liberty Mutual Insurance Company is a corporation duly organized under the laws of the State of Massachusetts, that Peerless Insurance Company is a corporation duly organized under the laws of the State of New Hampshire, and West American Insurance Company is a corporation duly organized under the laws of the State of Indiana (herein collectively called the "Companies"), pursuant to and by authority herein set forth, does hereby name, constitute and appoint, __Anna Barick, C. A. Johnson; Kristyn M.__
__Langbeen; Linda L. Austin; Margaret M. Kohloff; Michael D. Lechner; Michelle Buechel; Paul M. Hurley; Richard S. McGregor; Robert D. Hauer, T. R.__
__Guy__

all of the city of __Troy__, state of __MI__        each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents and shall be as binding upon the Companies as if they have been duly signed by the president and attested by the secretary of the Companies in their own proper persons.

IN WITNESS WHEREOF, this Power of Attorney has been subscribed by an authorized officer or official of the Companies and the corporate seals of the Companies have been affixed thereto this
__16th__ day of __October__, __2012__.

American Fire and Casualty Company
The Ohio Casualty Insurance Company
Liberty Mutual Insurance Company
Peerless Insurance Company
West American Insurance Company

By: _Gregory W. Davenport_
Gregory W. Davenport, Assistant Secretary

STATE OF WASHINGTON
COUNTY OF KING          ss

On this __16th__ day of __October__, __2012__, before me personally appeared Gregory W. Davenport, who acknowledged himself to be the Assistant Secretary of American Fire and Casualty Company, Liberty Mutual Insurance Company, The Ohio Casualty Company, Peerless Insurance Company and West American Insurance Company, and that he, as such, being authorized so to do, execute the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my notarial seal at Seattle, Washington, on the day and year first above written.

By: _KD Riley_
KD Riley , Notary Public

This Power of Attorney is made and executed pursuant to and by authority of the following By-laws and Authorizations of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, West American Insurance Company and Peerless Insurance Company, which resolutions are now in full force and effect reading as follows:

ARTICLE IV – OFFICERS – Section 12. Power of Attorney. Any officer or other official of the Corporation authorized for that purpose in writing by the Chairman or the President, and subject to such limitation as the Chairman or the President may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Corporation to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Corporation by their signature and execution of any such instruments and to attach thereto the seal of the Corporation. When so executed, such instruments shall be as binding as if signed by the President and attested to by the Secretary. Any power or authority granted to any representative or attorney-in-fact under the provisions of this article may be revoked at any time by the Board, the Chairman, the President or by the officer or officers granting such power or authority.

ARTICLE XIII – Execution of Contracts – SECTION 5. Surety Bonds and Undertakings. Any officer of the Company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Company by their signature and execution of any such instruments and to attach thereto the seal of the Company. When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

Certificate of Designation – The President of the Company, acting pursuant to the Bylaws of the Company, authorizes Gregory W. Davenport, Assistant Secretary to appoint such attorney-in-fact as may be necessary to act on behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

Authorization – By unanimous consent of the Company's Board of Directors, the Company consents that facsimile or mechanically reproduced signature of any assistant secretary of the Company, wherever appearing upon a certified copy of any power of attorney issued by the Company in connection with surety bonds, shall be valid and biding upon the Company with the same force and effect as though manually affixed.

I, David M. Carey, the undersigned, Assistant Secretary, of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, West American Insurance Company and Peerless Insurance Company do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy of the Power of Attorney executed by said Companies, is in full force and effect and has not been revoked.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seals of said Companies this __4th__ day of __June__, 20 __13__.

By: _David M. Carey_
David M. Carey, Assistant Secretary

POA - AFCC, LMIC, OCIC, PIC & WAIC
LMS_12873_041012

944 of 1000

*(left margin, vertical text)* Not valid for mortgage, note, loan, letter of credit, bank deposit, currency rate, interest rate or residual value guarantees.

*(right margin, vertical text)* To confirm the validity of this Power of Attorney call 1-610-832-8240 between 9:00 am and 4:30 pm EST on any business day.

# EVANS | PETREE pc

ATTORNEYS AT LAW

JUSTIN R. GILES, III
JGILES@EVANSPETREE.COM

DIRECT DIAL 901.474.6132
DIRECT FAX 901.297.4167

March 9, 2016

*Via Certified Mail -*
*Return Receipt Requested*

## PERFORMANCE BOND CLAIM

**To:**      **Surety:**
             Liberty Mutual Insurance Company
             5600 New King Street, Suite 360
             Troy, Michigan 48098

             **Contractor/Principal:**
             Devere Construction Company, Inc.
             1030 Devere Drive
             Alpena, Michigan 48707
             c/o Patrick D. Wilson
             200 W. Capitol Avenue
             Little Rock, Arkansas 72201

**From:**    **Owner:**
             CGH of McGehee AR 2011, L.P.
             4410 Leisure Time Drive
             Diamondhead, Mississippi 39525

**Re:**      **Project:**      **Cypress Grove Homes of McGeHee**

To Whom It May Concern:

Please be advised that this law firm represents CGH of McGehee AR 2011, L.P. ("CHG") with regard to the project known as Cypress Grove Homes of McGehee ("Project"). On or about June 4, 2013, Liberty Mutual Insurance Company ("Liberty"), as surety, issued a Performance Bond at Bond No. 013125690 ("Bond") in the amount of Three Million Eight Hundred Eighty Thousand Five Hundred and 00/100 Dollars ($3,880,500.00), in favor CGH for the principal's, Devere Construction Company, Inc. ("Devere"), performance of the construction contract.

It is CGH's position that Devere has failed to fully perform its obligations under the parties' construction contract for the Project. Specifically, Devere has failed to close gaps between the drip edge and fascia, failed to properly rough grade the property, failed to follow the siding detail causing water infiltration into the units and corresponding damage, failed to properly construct the slope of the carports causing water to pond at the entry door and infiltrate the interior units, failed to install soldier course brick at the corners of several units allowing for water penetration, failed to insulate the hot water tank pipes and failed to construct the Project according to the ADFA minimum design standards. Devere's failure to properly perform the construction contract has and is costing CGH hundreds of thousands of dollars. As



EXHIBIT

C



Liberty Bond Claim
March 9, 2016
Page 2

of today, CGH asserts a claim of Four Hundred Seven Thousand Sixty-Six and 00/100 Dollars ($407,066.00). See, the Hall Engineering Report attached hereto as <u>Exhibit A</u>. This claim does not include the impact damages of Devere's delays on the Project.

Pursuant to Section 3 of the Bond, please consider this letter as CGH's formal notice to Devere and Liberty that CGH considers Devere to be in default of the construction contract. Pursuant to Section 3.1 of the Bond, CGH is willing to schedule a conference with Devere and Liberty within ten (10) days of receipt of this Notice in order to discuss Devere's performance, CGH's damages and Liberty's intended course of action. It is CGH's position that Liberty is responsible for the correction of Devere's defective work, completion of Devere's construction contract, the delay costs CGH has incurred as a result of Devere's default and the actual damages caused by Devere's delayed performance and non-performance on the Project.

If Liberty fails to respond to this Notice, CGH will consider Liberty to be in default of its surety obligations. If the parties do not resolve the issues addressed herein, CGH will file suit under the Bond to enforce its rights under the Bond and construction contract. It is CGH's hope that such steps will not be necessary. To that end, CGH is prepared to provide you with any information that you may need to evaluate this claim.

It is CGH's suggestion that the parties meet for the conference at my office in Memphis, Tennessee. Once you have an opportunity to discuss this claim, please contact me to discuss scheduling the conference. In the interim, if you have any questions, please do not hesitate to contact me. I appreciate your prompt attention to this matter.

Sincerely,

Justin R. Giles, III

JRG/lm
Enclosure
cc:    Mr. Gary Gibbs
       Joseph T. Getz, Esq.
       Joel B. Sklar, Esq.

4820-3065-0159, v. 1



**PREPARED FOR:**
Cypress Grove

**ADDRESS INSPECTED**
McGehee, Lake Village, & Warren Properties
Hall Engineering Project Number: 16-0955

**PREPARED BY:**
HALL ENGINEERING INSPECTIONS
Po Box 241302
Little Rock, AR 72223
(501) 588-3355

February 4, 2016          Justin Hall, P.E.

Page 1 of 25

EXHIBIT

CPI, McGehee, Lake Village, & Warren



Dear Mr. Simmons,

On January 29, 2016 you requested that we provide an engineer to inspect the dwellings and properties and perform the following:

## SERVICES REQUESTED:

Evaluate the following:

1. Siding / Soldier course related issues (Associated Problems this creates and Estimated Cost to Correct)
   a. Code Considerations
   b. Architects letter and solution options
   c. Compare to Section A/8 of the drawings
   d. Grade Elevations
2. Roof Fascia Gaps and Misc. Gaps in the Soldier Course
3. ADEQ Issues created from Storm Water Management Failures (Warren Pine St)
4. Storm Water Pipe Failure (Warren Halligan Site)
5. Time of Construction – Reasonableness of Length
6. Review costs to repair/complete homes.

An engineer from Hall Engineers, Ltd. inspected the homes on February 2, 2016 in the presence of the CPI representative, Jeff Simmons. On the inspection day, the temperature was near 50° F with cloudy skies.

The buildings are one story, single-family homes with asphalt shingles and wood siding.

## HISTORY/STATEMENTS FROM CLIENT:

Jeff stated that many post-construction repairs had to take place because of water intrusion into the homes, grading, flooding, drain pipe collapse, and more.

CPI took care of many of the issues however many still exist and need to be rectified. Many cabinets had to be replaced because of water intrusion and new flashing had to be installed to stop future leaks.

CPI has also performed extensive drainage remediation and modifications to prevent flooding of homes and properties.

CPI, McGehee, Lake Village, & Warren

HALL
ENGINEERING

## OBSERVATIONS

The following issues were observed with the homes.

NOTE that these pictures represent a general problem with most homes. Some issues mentioned on the following pages vary slightly between homes but generally the same problems exist.

## WATER ENTRY INTO HOMES

Water is entering the homes along the outer walls. This leaking occurs because the siding terminates above the level of the slab. The brick ledge, also at or above the top of the slab, captures this water runoff and the water runs into the homes. In other areas, the carport slab is higher than the interior slab, so this problem continues from two areas. The water is damaging the cabinets, framing, carpets and insulation of the home. Many homes have this issue.

Client stated contractor installed caulking inside the home in an effort to stop water intrusion however it did not work all the time. CPI found this caulking when they had to remove some cabinets and base trim to repair water damaged areas. It appears as if the caulking was done to hide the water problem.

This is a violation of ICC Residential Code **R404.1.6 Height above finished grade.** Concrete and masonry foundation walls shall extend above the finished grade adjacent to the foundation at all points a minimum of 4 inches (102 mm) where masonry veneer is used and a minimum of 6 inches (152 mm) elsewhere.



Siding terminates on top of brick ledge which is above the slab grade.



CPL McGehee, Lake Village, & Warren

HALL ENGINEERING

Siding is not sealed so water is routed into the home in areas.

Carport slab is higher than the interior slab so water runs into the home.

Page 9 of 25



CPI: McGehee, Lake Village, & Warren

Hall ENGINEERING

Caulking installed by contractor

Caulking installed by contractor

Page 1 of 29

CPI McGehee, Lake Village, & Warren

*Hall*
ENGINEERING



Water damage to cabinets. They had to be replaced.

Water damage to cabinets. They had to be replaced.

CPI, McGehee, Lake Village & Warren

Hall
ENGINEERING



Water intrusion has damaged framing, carpet and carpet nailers.

CPI McGehee, Lake Village, & Warren



**Homes were not built per drawings:**

The drawings specify in great detail the concrete and grade requirements in regard to the slab of the home. None of these homes were built per the details below.



THRESHOLD DETAIL



BRICK LEDGE DETAIL

**Not building the homes per the drawings is the direct and absolute cause of water intrusion.**

CPI, McGehee, Lake Village, & Warren



Repair.
Because the homes are "complete," extensive and expensive repairs would be needed to fully correct the issues. CPI has accepted installation of flashing along the bottom edge of the siding to accommodate. See diagram of this proposed repair. These repairs will address most water intrusion issues EXCEPT those leaks in the concrete carport areas. A completely different and more expensive repair is required in those areas.

SHEATHING

ADD SIDING TO COVER OPEN JOINT

EXISTING SIDING

CONTINUOUS BACKER ROD AND SEALANT

ADD SHIM IN REQUIRED THICKNESS

BRICK

OPTION 2

ADD NEW SIDING OVER FLASHING

ADD GALVANIZED FLASHING

OPTION 1

CPI, McGehee, Lake Village, & Warren

*Hall*
*ENGINEERING*

## *WATER POOLING IN CARPORTS*

Water pools in the carports against the home. All concrete against the home is to have positive slope away the home so this does not occur. See page 7 of this report. Since water is pooling against the home, some of the water is going into the house. Eventually, in addition to the other issues, the water will damage the siding and paint. See diagram below of how water is intruding the home in the carport area.







CPI, McGehee, Lake Village, & Warren

Repair:
Water pooling must be fully rectified.   Removal of carport concrete is the best repair to ensure full water protection. Floating the concrete with a cover slurry to have positive drainage is more practical however less likely to last long term and is not a guarantee against future water intrusion. We at Hall Engineering do not suggest the slurry repair.

CPI McGehee, Lake Village, & Warren

Hall
ENGINEERING

### ROOF FASCIA/DRIP EDGE GAPS

The drip edge has large gaps at the fascia board. This allows water intrusion and is also not attractive at all. This represents poor construction practice and allows water into the living space. In many other cases, the drip edge is not even against the fascia. Several other homes have no drip edge at all.





CRP McGehee, Lake Village & Warren

HALL
ENGINEERING



**Repair:**
Replacement of fascia boards and drip edge is required where these issues exist (approximately 50% of homes).

CPI, McGehee, Lake Village, & Warren



## ADEQ ISSUES CREATED FROM STORM WATER MANAGEMENT FAILURES

On June 6, 2013 a complaint by a neighbor to the Warren property was raised to the ADEQ because of flooding of his property. In addition, the silt fence was not installed properly, per ADEQ guidelines.

Per the pictures in the complaint, the silt fence was not trenched into the ground at the base as required to prevent this flooding and flow of mud to neighboring land. Reference the ADEQ complaint for details. Burying of the base of the silt fence is standard construction practice.

I understand that because the water control was so poorly controlled that CPI had to purchase this neighboring property to above lawsuits. The water flow was damaging to the home and property that this was inevitable. In addition, CPI incurred fines which were due to ADEQ because these issues were not corrected timely.

Proper control of the water flow and collection and installation of the silt fence would have likely prevented flooding of the neighboring property and therefore would have prevented CPI from purchasing the property.

GPI McGehee, Lake Village & Warren

## HALL ENGINEERING

## STORM WATER PIPE FAILURE

A portion of the storm drain piping collapsed and caused considerable ground sinking at the Warren site. Upon exposing the remainder of the failed Storm Sewer pipe (not pictured), it was discovered that the sanitary sewer pipe from the two homes across the street were intersecting with the elevation of the fully circular storm sewer pipe. It was evident that the Storm Sewer pipe had been purposely compressed vertically to accommodate the depth of the sanitary line. This in turn compromised the integrity of the pipe couplings and overall weakening of the Sewer Pipe to allow it to collapse. At the time of this report, corrections are being made to keep the Storm Sewer Pipe at a full cross section along with an acceptable fall in the sanitary sewer line. This increases the repair cost by an additional $7,10,000 more than original estimated.





CPI McGahee, Lake Village, & Warren





Electrical service is to be disconnected, removed and reinstalled at CPI's cost.

Repair
Replace damaged piping. In addition, fines and fees required by Entergy are a
cost CPI must shoulder.

CPI, McGehee, Lake Village, & Warren

## TIME OF CONSTRUCTION – REASONABLENESS OF CONSTRUCTION

I was given a copy of the AIA Contract dated June 4, 2013 which states the contractor is to complete the homes within 270 days. I understand that some substantial change orders did get accepted with CPI.

On the Lake Village property, there were 549 days of construction minus 150 days of for the change order leaves 129 extra days for construction.

On the Warren property, there were 606 days of construction minus 150 days of for the change order leaves 186 extra days for construction.

On the McGehee property, there were 704 days of construction minus 150 days of for the change order leaves 284 extra days for construction.

CPI is looking for interest and loss of income penalties which they are entitled.

| | Start Date Item 1 | Substantial Completion Last Done | Days Construction | Change Order Adj Owner Approved | Late/Days Dom 24-Day To Change Order | Adjusted Time | Contracted Time | Extra Days In Gap |
|---|---|---|---|---|---|---|---|---|
| CPI Lake Village | 5/22/2013 | 11/16/2014 | 549 | 5/22/2014 | 150.00 | 599.00 | 170 | 129.00 |
| CPI Warren | 5/24/2013 | 7/11/2015 | 606 | 5/22/2014 | 150 | 655.00 | 170 | 186.00 |
| CPI McGehee | 8/20/2013 | 6/22/2015 | 704 | 5/22/2014 | 150 | 554.00 | 270 | 284.00 |

## COST OF REPAIRS – REASONABLENESS OF EXPENSES INCURRED

I was given a copy of the estimated and actual costs to do all the repairs to the properties. Those are included in appendix A of this report.

I reviewed these estimates and agree with the labor time and costs which have been incurred and will be incurred because of the issues and failure to complete the homes. I do, however, feel that the cost to re-grade the carports is HEAVILY underestimated because the actual costs to repair the grade properly will be over $500,000 PER PROPERTY.



CPI McGehee, Lake Village, & Warren

HALL ENGINEERING

c. Dot patios hold excessive water



d. Mold was found in many units which had water intrusion

Page 21 of 25

Cpl. McGehee, Lake Village, & Warren

*Hall*
ENGINEERING

c. Carpet trim was improper.



d. Paint is peeling from siding.

CPI McGehee, Lake Village, & Warren

**Hall ENGINEERING**

g.   Asphalt and concrete finishing is VERY poor.



h.   Doors do not seal properly.

These issues prove that the contractor was negligent completing the homes in a professional manner.

CPI, McGehee, Lake Village, & Warren



## CONCLUSIONS:

Based on the above investigation and analysis and to a reasonable degree of engineering certainty, the following conclusions are provided:

It is the opinion of Hall Engineers, Ltd. that all the above mentioned issues are because of contractor negligence. Water entry into the homes could have been prevented if the homes were built per the architectural drawings. Poor fascia installation is also a cause of water intrusion and must be repaired. The concrete carport slope is improper and causing water intrusion and will inevitably cause siding and wood damage.

Caulking of the interior bottom plate of the wall indicates the contractor knew of the issues at hand and attempted to hide the failures of construction. Extensive costs have been already and much more will be incurred to correctly address the issues mentioned in this report.

Lack of attention to ADEQ requirements and warnings led to fines and purchasing of the neighboring property. These are more costs CPI was not expecting and should not have incurred.

Storm pipe failure has also added to the expenses CPI should not have incurred and the cause of failure has yet to be determined.

These conclusions are based on preliminary and limited examinations and analyses. We reserve the right to supplement or amend these findings and/or opinions should new information become available. The scope of this service is limited to preliminary property inspection via routine visual means. Concealed discrepancies and or defects necessary limit the accuracy and scope of this report. The recommendations and opinions contained in this report are based on our professional judgment.

Respectfully submitted,
Hall Engineering Group, Ltd

Justin Hall, PE
Hall Engineering Group, Ltd, PO Box 241302, Little Rock, AR 72223
Direct: 501-588-3355, Fax: 501-400-7914, Justin@hall-engr.com
AR PE#11050, OK PE#27542, MO PE#2012036160.

CPI, McGehee, Lake Village, & Warren



Appendix A –

Actual and Estimate Costs to
Repair and Complete Homes

## CGH Warren

- Grade of Homes Lowered from original plans

  - Overages of Storm Water, and Sanitary Pipe was compromised.
    - Storm Water Pipe defected. These were corrected but we have no specific warranty in the event of problems          $ 77,300          Cost to Redirect and Repair sidewalk/road
    - Could have caused the problem of Telephone Cable line inserting water lines. Street had to be dug up had repairs made          $ 1,076          Plumbing Repair and Street Repair

- Silt fence and SWMP were not properly installed and maintained property.
  - Slte was breached and adjoin property was damaged.          $ 2,706          Laborers have expanded fixing silte / drain
  - ADEQ cited us with complaints. A fee of $25,000 was accessed. Later negotiated down          $      to date    $25,600.00          Fine we are subject to / Potential Ant
  - Had to retain an attorney for representation in negotiation of settlement.          $ 5,000          Direct Cost of the Attorney
  - Had to purchase adjoining land owners property in settlement of damage exposure.          $ 57,500          Cost of Homes and Closing Cost

- Change Order issued to compensation for delays and time lost for Credits being taken.
  - Budget was issued at the beginning of each project that put us in a credit amount due that could be used on other items.
  - First a Change order for a different Subcontractor in pick up Frame Carpentry Time. No effect on time though.          $ 60,000          Cost to use Alternate Sub vs Contracted Sub
  - Large Change Order in Lump Sum when work started back. Still on charge.          $ 110,000          Cost of Excess Concrete
    - If the Concrete work managed properly, that would have paid for this overrun.
  - We had to take over some of the items that they would or could not perform on.          $ 70,000          Cost Less the credit they gave back

- Love of many of the Homes have gaps between drip edge and fascia
  - Leads to roof life and water intrusion          $ 4,554          cost of effected roofs for 10%

- Rough Grade of Homes
  - We had to take over the fine grade and sod of the remaining portions of the lots.
  - Rough Grade should have gotten us within 1/10 foot.
  - The height of the houses was lowered too much. Compounded the problem with the siding not being water tight          $ 5,100          Greenscapes

- Siding Detail not being followed
  - Explanation given previously
  - This directly caused water damage to the units. Damaged Drywall, Insulation, Cabinet, mold issued
  - Would have been recognized earlier if they had not caulked the backside of base plates on certain units that were low.          $ 43,200          Labor / Time Estimated

- Concrete Carports / Entry slope and pond water against the wall and entry door
  - The detail not being followed then allows damage to the interior.          $ 13,200          Labor / Time Estimated

- Solder Course Brick not installed at the corners of several units.
  - Leads to some water intrusion problems          $ 150          Labor / Time Estimated

- Insulation on HW Tank Pipes not installed
  - Higher Energy Cost          $ 432          Cost to place on HW Tank

- Submission and Approval of Appliance Package
  - Did not submit appliance package for review
  - Refrigerators do not meet the ADPA requirement          $ 10,713          Cost of having last restock or sale

Additional Punch and Cleaning labor required to get units ready

    a. In order to get units ready quicker, we had additional manpower to fix many punch out items.
    # Stunted on Windsor Point because problems were not being addressed.         -$  3,798                 Cost to Correct

## CSH McGehee:

A) Elevated Units Problems

    1   If Site Work was started timely, slab on grade could have been poured much sooner
    2   Same Siding Detail allowed water to flow into the unit from gap in siding/soldier course
         a   Crawl space is very difficult to dry out as a result

    3   Roof on seven elevated Units were left open over a weekend.
         a   Ceiling fell in and water damage to drywall, insulation and cabinet                 sub pd
         b   Damage repaired but we have lingering problem with:                      sub pd
         c   Mold behind Cabinets                                            $      420
         d   Swell in subfloor, plank floor then had to have Luam plywood installed      $   4,620

B) Delay in getting restarted on the elevated units caused the plywood deck to deteriorate.
         a   Should have been protected or replaced.
         b   Was not adequate to accept plank floor without Luam being put over the deck      $   5,180

C) Change Order issued to compensate for delays and time lost for Credits being taken.
         a   Budget was issued at the beginning of each project that put us in a credit amount due that could be used on other items.
         b   First a Change order for a different Subcontractor to pick up Frame Carpentry Time. No effect on time though.
         c   Large Change Order is Lump Sum when work started back. Still no change.           $   17,000      Cost to use Alternate Sub vs Contracted Sub
         d   If the Concrete were managed properly, that would have paid for this overrun.        $   110,000     Cost of Excess Concrete
         e   We had to take over many of the items that they would or could not perform on.      $   130,000     Cost less the credit they gave back  --

D) Eave of many of the Homes have gaps between drip edge and fascia
         a   Leads to roof life and water intrusion                              $   4,554        cost of effected roofs for 20%

E) Rough Grade of Homes
         a   We had to take over the fine grade and sod of the remaining portions of the lots.
         b   Rough Grade should have gotten us within 1/10 feet.                  $   16,000        Greenscape

F) Siding Detail not being followed
         a   The height of the houses was lowered too much. Compounded the problem with the siding not being water tight
         b   Explanation given previously
         c   This directly caused water damage to the units. Damaged Drywall, insulation, Cabinet, mold issued
         d   Would have been recognized earlier if they had not caulked the backside of base plates on certain units that were low.     $   43,200     Labor / Time Estimated

G) Concrete Carports / Entry slope and pond-water against the wall and entry door
         a   The detail not being followed then allows damage to the interior.              $   5,000       Cost to Root Out

H) Soldier Course Brick not installed at the corners of several units.
         a   Leads to some water intrusion problems                          $   150        Labor / Time Estimated

I) Insulation on HW Tank Pipes not installed

| | | | | | |
|---|---|---|---|---|---|
| e | Higher Energy Cost | | $ | 432 | Cost to place on HW Tank |

J) Submission and Approval of Appliance Package
| a | Did not submit appliance package for review | | | | |
| b | Refrigerators do not meet the ADFA requirement | $ | 10,713 | Cost of Refrig lost restock or sale |

K) Additional Punch and Cleaning labor required to get units ready
| a | In order to get units ready quicker, we had additional manpower to fix many punch out items. | | | | |
| b | Started on Windsor Point because problems were not being addressed. | $ | 5,697 | Cost to Correct |

L) Purchase of Adjoining Land to keep Site Work in Budget
| a | Site Contractor had in his price, DeVera did not retain $$ to be sure it was paid for | $ | 53,000 | Purchase Price / Closing Statement |

Total

## CGH Lake Village

A) Concrete Carports / Entry slope and pond water against the wall and entry door
| a | The detail not being followed then allows damage to the interior. | $ | 6,000 | Cost to Float Out |

B) Additional Punch and Cleaning labor required to get units ready
| a | In order to get units ready quicker, we had additional manpower to fix many punch out items. | | | | |
| b | Started on Windsor Point because problems were not being addressed. | $ | 11,394 | Cost to Correct |

C) Insulation on HW Tank Pipes not installed
| a | Higher Energy Cost | $ | 432 | Cost to place on HW Tank |

D) Siding Detail not being followed
| a | The height of the houses was lowered too much. Compounded the problem with the siding not being water tight | | | | |
| b | Explanation given previously | | | | |
| c | This directly caused water damage to the units. Damaged Drywall, Insulation, Cabinet, mold issued | | | | |
| d | Would have been recognized earlier if they had not caulked the backside of base plates on certain units that were low. | $ | 43,200 | Labor / Time Estimated |

E) Eave of many of the Homes have gaps between drip edge and fascia
| a | Leads to roof life and water intrusion | $ | 4,554 | cost of effected roofs for 10% |

Total      $    970,276



# EVANS | PETREE pc
### ATTORNEYS AT LAW

JUSTIN R. GILES, III
JGILES@EVANSPETREE.COM

DIRECT DIAL 901.474.6122
DIRECT FAX 901.297.4167

March 31, 2016

*Via Email And*
*Via Certified U.S. Mail -*
*Return-Receipt Requested*

John E. Sebastian
Watt, Tieder, Hoffar & Fitzgerald, LLP
10 South Wacker Drive, Suite 2935
Chicago, Illinois 60606

Copy To:
Patrick D. Wilson
Wright, Lindsey & Jennings, LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201
*Counsel for Devere Construction Company*

|     |            |                                                                      |
|-----|------------|----------------------------------------------------------------------|
| Re: | Principal: | Devere Construction Company, Inc.                                    |
|     | Obligees:  | CGH of McGehee AR 2011, L.P.; CGH of Lake Village AR 2011, L.P.; and CGH of Warren AR 2011, L.P. |
|     | Bond No.:  | 013125690; 013125547; and 013125544                                  |
|     | Project:   | Cypress Grove Homes of McGehee; Cypress Grove Homes of Lake Village; and Cypress Grove Homes of Warren |
|     | Surety:    | Liberty Mutual Insurance Company                                     |

Dear John:

I hope you are well. I apologize for the delay in responding to your letter dated March 18, 2016 (the "Letter"); however, it was only sent via email and was caught as spam. I reviewed your letter this morning and would like to respond. First, given our recent conversations, it was my belief that Liberty Mutual Insurance Company (the "Surety") had already declared the Contractor, Devere Construction Company, Inc. ("Devere"), to be in default and/or accepted a voluntary default from Devere. My assumption was based on your February 4, 2016 letter that included the Letter of Default from Devere. See attached. Moreover, based on our recent telephone conversation, in which you indicated that the Surety would like to schedule a conference in the upcoming weeks to discuss the issues presented in our demand, I assumed all required notices were in place. This assumption was further justified when you subsequently notified me by email that Liberty and Devere were on the project sites in Arkansas to inspect the defects identified in our notice. A copy of the Notice is included herein.

While you indicate in the Letter that my clients (the "Obligees") have not met the conditions precedent to trigger the Surety's obligations, it is my belief that they have met those



EXHIBIT

D



# E|P

Liberty/Devere
March 31, 2016
Page 2

conditions precedent. Notwithstanding, please allow me to restate by way of this correspondence
and its attachments that the Obligees are considering/declaring a Contractor Default. Therefore,
under paragraphs 3.1 and 3.2 of the bonds, the Obligees are requesting a conference with the
Contractor and Surety to discuss performance/resolution of the contracts and claims. As of now,
it is our belief that there are no outstanding contractual obligations or payments owed to the
Contractor that are required to be paid to the Surety under paragraph 3.3 of the bonds.

Please let me know when the Surety and Contractor would like to schedule the
conference. It was my initial understanding from our call that you would be on vacation this
week and would contact me upon your return with proposed dates for the conference. We are
generally available in April for such meeting and will coordinate with you to find a mutually
agreeable date(s).

As to the documents the Surety requested in the Letter, I will secure them to the extent
possible and forward them to you by separate letter in advance of the conference. If you have
any questions, please do not hesitate to contact me.

Sincerely,

Justin R. Giles, III

JRG/lm
Enclosures
cc:     Mr. Gary Gibbs
        Joel B. Sklar, Esq.
        Joseph T. Getz, Esq.

4819-0978-8463, v. 1



**WATT TIEDER**

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.

10 South Wacker Drive, Suite 2935
Chicago, Illinois 60606

Telephone: 312-219-6900
Facsimile: 312-550-2758
www.wattlieder.com

John E. Sebastian
Attorney
Direct Telephone: 312-219-6912
Direct Facsimile: 312-559-2758
jsebastian@wattlieder.com

February 4, 2016

<u>VIA FEDEX</u>

CHG of McGeHee AR 2011, L.P.
4410 Leisure Time Drive
Diamondhead, MS 39525

Re:   Contractor:   Devere Construction, Inc.
      Project:      Cypress Grove Homes of Warren, AR (Single Family Homes and
                    Community Center)
      Matter:       Notice of Termination of Contract

Dear Contracting Officer:

I represent Liberty Mutual Insurance Company ("Liberty") in connection with surety credit it extended to Devere Construction, Inc. ("Devere") and the indemnitors. Namely, Liberty issued a bond for the subject project. As you know, Devere has demobilized from the project. Pursuant to agreement between Liberty, Devere, and the indemnitors Devere provided Liberty a letter voluntarily defaulting/terminating its rights on the project and contract ("Termination Letter"). Attached is the Termination Letter for the subject contract/project. Liberty is currently investigating the details of the bonded project and requests a current account of the contract funds, the list of completed and uncompleted work, the current schedule, and issues that may exist regarding completion. Should Liberty choose to arrange for substitute performance, Liberty will propose a Takeover Agreement that identifies, among other items, the contract balance, the scope of work, Liberty as a completing surety, does not waive the penal sum by completion, reduces the penal sum for payment, and reserves pending claims and defenses.

When you have reviewed this letter and attachments, please contact me.

Very truly yours,

Watt, Tieder, Hoffar & Fitzgerald, LLP

By: _____
        John E. Sebastian

JES/mc

# DEVERE CONSTRUCTION COMPANY, INC.

1030 DEVERE DR.
ALPENA, MI 49707

December 2, 2015

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

CGH of Warren AR 2011
4410 Leisure Time Drive
Diamondhead, MS 39525

Re:  Principal:   DeVere Construction Company, Inc.
     Project:     Cypress Grove Homes of Warren, AR (Single Family Homes
                  and Community Center)
     Surety:      Liberty Mutual Insurance Company
     Obligee:     CGH of Warren AR 2011, L.P.
     Bond:        013125544
     Matter:      Letter of Default

To Whom It May Concern:

This is to advise you that DeVere Construction Company, Inc. ("DeVere"), the contractor on the above-referenced construction Project, is financially unable to perform or complete the performance of the work or comply with its contractual obligations on the above Project, and is in default under the above Contract for the Project. Therefore, DeVere hereby irrevocably and voluntarily waives DeVere's right to be declared in default as well as DeVere's right to cure such a default as provided in the Contract and DeVere does hereby terminate its right to complete the above construction Contract effective upon your receipt of this letter. Our surety, Liberty Mutual Insurance Company, will be in contact with you to discuss this matter.

Very truly yours,

DEVERE CONSTRUCTION COMPANY, INC.

By: _____, Treas.
    It's Authorized Representative

cc: Regina E. Gaebel, Esq.
    John E. Sebastian, Esq.

RITA REED HARRIS, P.A.
ATTORNEY AT LAW

POST OFFICE BOX 787
FORREST CITY, ARKANSAS 72336-0787

7016 2140 0000 3436 7521




U.S. POSTAGE
PAID
FORREST CITY, AR
72335
JAN 26 17
AMOUNT
**$12.45**
R2305E124709-10

Liberty Mutual Insurance Company
c/o Corporation Service Company
300 South Spring Street, Suite 900
Little Rock, AR 72201